UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JAMES O'CONNOR

                    Plaintiff,

- against -

CIGNA LIFE INSURANCE COMPANY OF NEW YORK,
and the LONG TERM DISABILITY PLAN OF SALOMON
SMITH BARNEY, INC.

                    Defendants.
-----------------------------------------------------------------------X

Civil Action No.
CV 03 3874
**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff, James O'Connor, by his attorneys, Binder & Binder, P.C., for his complaint against the defendants CIGNA Life Insurance Company of New York (the "Insurance Company"),[1] and the Long Term Disability Plan of Salomon Smith Barney (the "LTD Plan"), alleges as follows:

## JURISDICTION AND VENUE

1. Jurisdiction of the Court is based upon 29 U.S.C. §§ 1132(e)(1) and 1132(f), which give the District Courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan. In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

2. Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"), the long term disability plan at issue in this litigation must contain provisions for the administrative or internal appeal of a denial of benefits. Plaintiff has exhausted all administrative avenues of appeal, and has received a final

---

[1] The name of the Insurance Company was changed to CIGNA Life Insurance Company of New York effective July 19, 1999.

denial. This matter is properly before this court for *de novo* judicial review as there is no explicit grant of discretionary authority in accordance with *Kinstler v. First Reliance Std.Life Ins. Co.*, 181 F.3d 243 (2d Cir. 1999).

3. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2), which allows an action under Title I of ERISA to be brought in the district where the long term disability plan is administered, where the breach took place, or where a defendant resides or may be found.

## NATURE OF ACTION & JURY DEMAND

4. This action seeks to recover long term disability income benefits pursuant to the terms and conditions of an employee welfare benefit plan. As the relief sought is monetary in nature, pursuant to *Great-West Life v. Knudson*, 534 U.S. 204 (2002), Plaintiff requests a trial by jury. Salomon Smith Barney, Inc. (the "Employer") established and maintains the LTD Plan, which provides for group long term disability benefits. As the LTD Plan is an employee benefit welfare plan established and maintained by an employer or employee organization for the benefit of its employees, ERISA applies to this action. Said benefits were effective at all times relevant herein.

## THE PARTIES

5. Plaintiff was born on February 20, 1943, is presently 60 years old, and is a resident of Lindenhurst, New York.

6. Upon information and belief, the Employer sponsored the LTD Plan, and the employees who elect coverage pay the full cost of the LTD Plan. The name of the Plan Administrator is Plans Administration Committee of Citigroup Inc., which is located at One Court Square, 15th Floor, Long Island City, NY 11120. Citigroup Inc., located at the same address, is the agent for service of legal process.

7.   The Insurance Company is a business organization licensed to conduct the business of insurance in the State of New York. Benefits under the LTD Plan are provided through a group insurance contract, No. NYK-2260 (the "Policy"), that the Insurance Company issued to the Employer.

## STATEMENT OF FACTS

8.   Prior to and including April 1, 2001, Plaintiff worked as Manager of Corporate Security for the Employer for nearly a decade.

9.   Prior to and including April 1, 2001, Plaintiff, together with other regular employees of the Employer, was covered as a participant under the LTD Plan. The LTD Plan provides for payment of monthly income benefits to participants of the LTD Plan who become disabled. The monthly benefit is based on a set percentage of pre-disability eligible compensation, 60%, and is reduced by other income benefits as these terms are identified in the LTD Plan. Benefits under the LTD Plan commence after the expiration of a 90 day elimination period. The maximum benefit period under the LTD Plan for a disability that began prior to age 60 is to age 65.

10.   The LTD Plan provides in relevant part:

You will be considered Totally Disabled if, because of Injury or Sickness, you are unable to perform all the essential duties of your occupation.

…

Applicable to Class 2 Only

After Monthly Benefits have been payable for 60 months, you will be considered Totally Disabled only if, because of Injury or Sickness, you are unable to perform all the essential duties of any occupation for which you are or may reasonably become qualified based on your education, training or experience.

11. Class 2 applies to Plaintiff because he worked more than 30 hours a week on a regular basis, and earned between $50,001 and $149,999.99 annually.

**Vocational Background**

12. Plaintiff, who worked his entire life, had an impressive 36 year work history.

13. For the last decade of his career, from September 20, 1991 until April 1, 2001, Plaintiff worked for the Employer in Manhattan with the title Security Manager. Plaintiff's duties included: (a) planning, directing and overseeing the implementation of comprehensive security systems for the protection of the Employer; (b) investigating crimes perpetrated against the Employer; (c) inspecting the Employer's premises at several locations to determine security needs; (d) studying physical conditions, observing activities, and conferring with the Employer's staff to obtain data regarding internal operations; (e) analyzing compiled data and planning and directing installation of electronic security systems; (f) directing installation and checking operation of electronic security equipment; (g) conducting surveillance of suspects and premises to apprehend culprits; (h) notifying the Employer of security weaknesses; and (i) supervising 30 guards for 3 buildings for safety and security.

14. According to the Employer, Plaintiff's job required standing 4 hours a day for lobby and post supervisory duties, walking up to 4 hours a day for site and emergency response duties, lifting and carrying up to 20 pounds, and balancing, stooping, crouching, and kneeling up to a third of the day. Plaintiff worked from 7A.M to 4 P.M., and reported to the Director of Security.

15. On April 1, 2002, Plaintiff stopped working because his back and leg problems had become too severe to enable him to continue performing his work duties. At that time Plaintiff was earning $80,000 a year. On May 22, 2001, Plaintiff

4

tried returning to work; however, despite his best efforts, he was unable to fulfill his work duties due to his medical condition, and he had to stop working on June 6, 2001.

16. According to the Dictionary of Occupational Titles ("DOT"), Plaintiff's occupation is that of Chief Guard, also known as Plant Protection Supervisor. The DOT code for Chief Guard is 372.167-014, which is classified as light work. Light work requires lifting and carrying 20 pounds and being on one's feet 6 to 8 hours a day.

**The Insurance Company's Bad Faith Vocational Review**

17. In a one paragraph report dated August 16, 2002, Gregg Schwartzkopf conducted a vocational review for the Insurance Company, and erroneously classified Plaintiff's job as a Superintendent, Plant Protection, DOT 189.167-050 ("Superintendent"). It is unclear whether Mr. Schwartzkopf intentionally or negligently misclassified Plaintiff's occupation as a Superintendent, which is a sedentary job.

18. Plaintiff's job duties and responsibilities were that of a Chief Guard, not Superintendent:[2]

(a) A Chief Guard performs various security duties, such as inspecting packages, testing systems and responding to site duties and emergencies, while a Superintendent does not. Plaintiff performed those security duties on a daily basis;

(b) A Chief Guard trains personnel, while a Superintendent does not. Plaintiff's job required him to train personnel;

---

[2] Plaintiff would be entitled to benefits under the LTD Plan even if Superintendent were the correct occupation because, as alleged below, the medical evidence shows that Plaintiff is incapable of performing the physical requirements of a Superintendent.

5

(c) A Chief Guard responds to site and emergency calls, while a Superintendent does not; a Superintendent merely establishes the procedures for those subordinates who perform the physical security duties. Plaintiff actually responded to site and emergency calls;

(d) Many of the duties listed in the DOT for Superintendent, such as directing or supervising workers involved in industrial safety programs, performing building maintenance or janitorial services, were not performed by Plaintiff because they were the responsibilities of other people at the Employer.

19. The primary responsibility listed in Plaintiff's job description is "Assist Supervisors in performance of their duties." Moreover, as noted in the occupational description form that the Insurance Company asked the Employer to complete, Plaintiff actually assisted in the "lobby and post supervisory" duties; he did not simply oversee those people performing their duties. Mr. Schwartzkopf misrepresented that Plaintiff was responsible for "overseeing supervisors."

20. Mr. Schwartzkopf's failure to consider that the lobby and post supervisory duties required Plaintiff to stand 4 hours a day was no accident. Nor was ignoring the fact that the Employer confirmed that Plaintiff spent up to 4 hours a day for site and emergency responses, and only 2 hours a day sitting to perform administrative duties. Mr. Schwartzkopf's disregarding both the Employer's and Plaintiff's evidence concerning his occupation could not have been in good faith.

21. Mr. Schwarzkopf also ignored the part of Plaintiff's job description entitled "General Description." The General Description states that the Security Manager reports to the Director of Security. Plaintiff's job description and the

6

Employer's occupation description show that Plaintiff reported to the Director of Security.

22. Plaintiff was responsible for supervising 30 guards at 3 buildings for safety and security. Plaintiff's job was not sedentary because he had to perform the actual security duties, and because he had to travel among the 3 buildings.

23. In a letter dated April 8, 2003 that appealed the denial of benefits, Plaintiff's counsel explained to the Insurance Company why Plaintiff's job was that of a Chief Guard and not a Superintendent. However, in a letter dated April 25, 2003, the Insurance Company rejected Plaintiff's appeal, stating that it needed "the report from the vocational expert that determined Mr. O'Connor's correct occupational title would be Chief Guard, as well any medical information you may wish to submit."

24. In a letter dated May 20, 2003, Plaintiff's counsel stated that Mr. Schwartzkopf's determination was so obviously flawed, that a vocational expert was not needed to explain why Chief Guard is the correct occupation. Nevertheless, Plaintiff's counsel informed the Insurance Company that Plaintiff's counsel provided the claim file to a vocational expert who confirmed the vocational findings and conclusions in the April 8, 2003 letter.

25. Because the Insurance Company's April 25, 2003 letter failed to specify why the medical evidence failed to support Plaintiff's disability or what other medical evidence would suffice to establish Plaintiff's disability, providing Plaintiff the opportunity to submit additional medical evidence was a meaningless gesture.

26. When the Insurance Company failed to reverse its denial of benefits, by letter dated June 17, 2003, Plaintiff's counsel submitted the report of the vocational expert who confirmed the findings and conclusions in the April 8, 2003 letter.

**Social Security**

27.     On December 18, 2001, Plaintiff informed the Insurance Company that the Social Security Administration (the "SSA") had awarded him disability benefits. The SSA determined that Plaintiff's impairments were so severe that he was unable to engage in any kind of substantial gainful work as of April 6, 2001.  Plaintiff's condition was so obviously disabling that he was awarded his Social Security Disability benefits without even having to proceed to an administrative hearing.

28.     The Insurance Company did not act impartially as it simply dismissed the Social Security award as irrelevant contending that SSA's decision was not binding upon the Insurance Company.

**Medical Records**

29.     Plaintiff stopped working due to musculoskeletal problems.  Dr. Santo Fiumano is Plaintiff's internist, and he referred Plaintiff to Dr. Kevin Mullins, who is Plaintiff's treating neurologist, because of the musculoskeletal problems.

30.     Because his back and leg problems had gotten worse, Plaintiff was sent for an MRI of the lumbar spine in February 2001.  The MRI revealed degenerative disc disease at the L5-S1 level, and severe stenosis at the L4-5 level with a grade 1 spondylolisthesis and herniated disc causing severe stenosis.[3]

31.     On February 28, 2001, Dr. Mullins noted that Plaintiff originally injured his back in a bomb explosion in 1981 when working as a detective in the New York City Police Department bomb squad, and that the condition had progressively deteriorated since then.  Dr. Mullins' objective clinical findings included absent bilateral

---

[3] Spinal stenosis is the narrowing of the spinal canal and it causes back and leg pain.  Harrison's, *Principles of Internal Medicine*, Ch. 16, Neck and Back Pain, 14th Ed. (1998).

ankle jerks, and positive straight leg raises, which are indicative of nerve root injuries at the L5 and S1 levels. Dr. Mullins advised Plaintiff to have surgery.

32. Because Plaintiff wanted to try to return to work, on May 18, 2001, Dr. Mullins cleared him to do so, but Dr. Mullins opined that he expected a recurrence of Plaintiff's symptoms given the severity of his spinal stenosis. Only 2 weeks after returning to work, just as Dr. Mullins had anticipated, Plaintiff had to stop working because his symptoms increased with resumed work activity.

33. On June 6, 2001, Dr. Fiumano concluded that Plaintiff was disabled with severe lumbar disc disease. On June 28, 2001, responding to an Insurance Company request for information, Dr. Fiumano advised that Plaintiff should not stand, lift, pull or carry, and would be disabled indefinitely as his condition would not improve.

34. On August 15, 2001, the Insurance Company's medical review concluded that "Medical does support R&L's as described by the physician's notes." In other words, the medical evidence supported the restrictions and limitations that Plaintiff stated prevented him from working. Consequently, on August 15, 2001, the Insurance Company approved benefits under the LTD Plan.

35. A couple of months later, on November 2, 2001, Dr. Fiumano completed the Insurance Company's disability assessment. Dr. Fiumano diagnosed Plaintiff with degenerative joint disease, carpal tunnel syndrome, hypertension, hyperlipdemia, hiatial hernia, and esophagitis, for which he was prescribed Percocet, Celebrex, Prevacid and Lipitor. More importantly, Dr. Fiumano concluded that in an 8 hour day, Plaintiff could do no lifting, carrying, stooping, kneeling or crouching, and could sit, stand and walk less than 2.5 hours. To leave no doubt that Plaintiff's condition would not improve, Dr. Fiumano explicitly stated that Plaintiff was permanently disabled.

36. On March 12, 2002, an Insurance Company medical reviewer merely concluded "reported stenosis at L4-5" with no other findings.

37. Inexplicably, the same person reviewed the file again the very next day. This second report claimed that Plaintiff had no neurological deficits, and was cleared to return to work. In any case, the reviewer, whose credentials and name were not given, professed that Plaintiff could not do prolonged walking or standing, which his occupation required.

38. The Insurance Company's medical reviewer disregarded Dr. Mullins' neurological findings. Dr. Mullins recorded that Plaintiff had reflex deficits and positive straight leg raises, and he did not unconditionally clear Plaintiff to return to work. Dr. Mullins specifically warned that if Plaintiff returned to work, the symptoms which had stopped him from working would recur, which is precisely what happened.

39. On April 17, 2002, Richard Handelsman, an Insurance Company internist, spoke with Dr. Fiumano. Consistent with Dr. Mullins' warning that Plaintiff's symptoms would return if he resumed work, Dr. Fiumano stated that Plaintiff was doing better now that his activity level had decreased since being out of work. Dr. Fiumano also confirmed that Dr. Mullins' neurosurgical evaluation had found reflex deficits and severe stenosis at L4-5 based upon the lumbar MRI. Dr. Fiumano reiterated that Plaintiff should have surgery because he is only able to walk around slightly and to sit for short periods because of constant pain, which precludes any sustained functional capacity for any occupation. Notably, Dr. Handelsman failed to state that Plaintiff could return to work.

**The FCE**

40. On June 20, 2002, the Insurance Company paid a physical therapist to perform a Functional Capacity Evaluation ("FCE"). The physical therapist was told that Plaintiff's job was a sedentary one.

41. According to the physical therapist's FCE, Plaintiff was restricted to a sedentary work capacity because he had a limited ability to stand or walk.

42.     The physical therapist found multiple neurological deficits during his exam.  Notably, when Plaintiff stated that his job required frequent standing and walking, the physical therapist stated that if Plaintiff's statement were true, then it would be difficult for him to return to work.  Thus, if the physical therapist had been provided with the correct vocational information, that Plaintiff had worked as a Chief Guard, he would have concluded that Plaintiff could not return to his former occupation.

**The Insurance Company's Bad Faith Medical Analysis**

43.     The Insurance Company's blind acceptance of the FCE reveals that its medical review was not performed in good faith.  The Insurance Company terminated Plaintiff's benefits even though there was not a single doctor who concluded that Plaintiff's condition had improved or that he could return to work in any capacity.

44.     On July 26, 2002, the Insurance Company falsely claimed that Dr Fiumano said that he had no objective evidence to support Plaintiff's claim.  Dr. Fiumano explicitly denied that he ever said there was no objective evidence supporting that Plaintiff's condition was disabling.  To the contrary, Dr. Fiumano stated that he told the Insurance Company that the February 2001 lumbar MRI, as well as his clinical examination findings, constitute objective medical evidence supporting Plaintiff's claim.

45.     In a letter dated March 30, 2003, to prevent the Insurance Company from mischaracterizng his statements, Dr. Fiumano confirmed that the lumbar MRI demonstrated that Plaintiff had severe spinal stenosis, disc herniation and severe disc degeneration, all of which were the pathology of his symptoms.

46.     The Insurance Company's reliance on the FCE's conclusions could not have been in good faith, in light of the diagnostic medical evidence, the clinical findings of the treating physicians, and in the absence of any medical evidence showing that Plaintiff's condition improved.  This is especially true since Plaintiff's condition is not

capable of resolving on its own; it is permanent and the only potential for improvement would be to risk surgery.

47. Despite failing to offer any basis for rejecting opinions of the treating physicians, and despite lacking any evidence that Plaintiff's condition had improved, on July 31, 2002, the Insurance Company told Plaintiff that his benefits would be terminated based upon the opinion of the physical therapist.

48. The Insurance Company's failure to provide any basis for rejecting the opinions of Dr. Fiumano and Dr. Mullins in itself is arbitrary and capricious, particularly since the Insurance Company substituted a physical therapist's opinion for those two physicians' opinions. In fact, there is no opinion to the contrary from any doctor who examined Plaintiff or his medical records.

49. The Insurance Company promised Plaintiff "an objective and independent review" on appeal. However, as the appeal reiterated the identical grounds for upholding the denial, it is clear that Plaintiff did not receive an objective and independent review, but rather, the termination was simply rubber stamped.

### PLAINTIFF'S CAUSE OF ACTION FOR LONG TERM DISABILITY BENEFITS

50. Plaintiff repeats each and every allegation contained in paragraphs 1 through 49 as if set forth fully herein.

51. Fiduciaries are statutorily obligated to perform their duties prudently, solely in the interest of plan participants and beneficiaries, and strictly in conformance with the provisions of the Plan. Fiduciaries also have a statutory obligation to interpret and construe the terms of the plan fairly, and make decisions in accordance with plan language.

52. The Plan Administrator for the LTD Plan has not made any decisions concerning Plaintiff's claim for LTD benefits. The Insurance Company, which upon

information and belief has a pecuniary interest in denying claims, made the administrative claim decisions.

53. The decisions of the Insurance Company were not premised upon the terms and definitions of the LTD Plan as described by the Summary Plan Description.

54. The Insurance Company's decisions were not supported by the medical evidence, did not apply the language of the LTD Plan, and were tainted by conflict of interest.

55. Plaintiff was and remains disabled within the terms and conditions of the LTD Plan; therefore, Plaintiff is entitled receive monthly LTD benefits from on or about April 1, 2001 to the present.

## DEMAND FOR TRIAL BY JURY

56. Plaintiff demands a trial by jury of all issues triable as of right.

**WHEREFORE,** Plaintiff respectfully requests this Court to:

A. Declare and determine that under the terms of the LTD Plan, that Plaintiff's disability began on or about April 1, 2001, and that he continues to be disabled thereunder;

B. Order Defendants to compensate Plaintiff for his disability in accordance with the terms of the LTD Plan;

C. Award Plaintiff his attorneys' fees pursuant to 29 U.S.C. § 1132(g); and

  D. Grant Plaintiff such other necessary and proper relief, including interest, costs and disbursements, as to which he may be entitled.

Dated: Ronkonkoma, NY
    July ___ , 2003

                BINDER & BINDER P.C.

           By: _____
                Harry J. Binder (HJB 5450)
                Attorneys for Plaintiff
                2805 Veterans Memorial Highway
                Ronkonkoma, NY 11779
                (631) 361-6699